UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RACHEL H.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 1:24-cv-1636-MJD-JRS |
| | ) |
| FRANK BISIGNANO, COMMISSIONER OF SOCIAL SECURITY,[2] | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Claimant Rachel H. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. *See* 42 U.S.C. § 423(d); 42 U.S.C. § 1382. For the reasons set forth below, the Court **REVERSES** the decision of the Commissioner.

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Frank Bisignano was automatically substituted as the Defendant in this case when he became the Commissioner of the Social Security Administration on May 7, 2025. **The Clerk shall update the Docket to reflect this change.**

## I. Background

Claimant applied for DIB and SSI in September 2022, alleging an onset of disability as of March 21, 2019. [Dkt. 10-5 at 2, 8.] Claimant's applications were denied initially and again upon reconsideration, and a hearing was held before Administrative Law Judge Fredric Roberson ("ALJ") on February 21, 2024. [Dkt. 10-2 at 45.] On March 14, 2024, ALJ Roberson issued his determination that Claimant was not disabled. *Id.* at 11. The Appeals Council then denied Claimant's request for review on July 31, 2024. *Id.* at 2. Claimant timely filed her Complaint on September 19, 2024, seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423.[3] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is

---

[3] DIB and SSI claims are governed by separate statutes and regulations that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to those that apply to DIB.

disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform her past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform her past relevant work, but can perform certain other available work, she is not disabled. 20 C.F.R. § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). If, at any step, the ALJ can make a conclusive finding that the claimant either is or is not disabled, then he need not progress to the next step of the analysis. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (citing 20 CFR § 404.1520(a)(4)).

The Seventh Circuit recently set forth the proper standard of review in an appeal of the denial of disability benefits as follows:

> [W]e review the ALJ's decision deferentially, affirming if its conclusions are supported by substantial evidence. 42 U.S.C. § 405(g); *Deborah M. [v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021)]; *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000) (ALJ's residual functional capacity determination "must be supported by substantial evidence in the record"). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103, 139 S.Ct. 1148, 203 L.Ed.2d 504 (2019), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). While we do not reweigh evidence, we conduct a critical review because a decision "cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In addition, an ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. That logical bridge can assure a reviewing court that the ALJ considered the important evidence and applied sound reasoning to it. See *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).

*Moy v. Bisignano*, 142 F.4th 546, 552 (7th Cir. 2025). This is the standard the Court will apply in this case.

3

In his brief, the Commissioner describes the applicable standard as follows:

> Review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence. 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019). As the Supreme Court has explained, "the threshold for such evidentiary sufficiency is not high." *Id.* In applying the substantial evidence standard, the court must not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

[Dkt. 14 at 4.] So far, so good. However, the Commissioner continues:

> For these reasons, an administrative decision may be "reverse[d] only if the record compels a contrary result;" if reasonable minds could disagree about whether the claimant is disabled, the administrative decision must be affirmed. *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

[Dkt. 14 at 4.] The quoted language does not appear in *Schloesser*, although the case does state that "[a]s long as the Appeals Council identified supporting evidence in the record and built a 'logical bridge' from that evidence to its conclusion, we must affirm. This is true even if reasonable minds could differ about the ultimate disability finding." *Schloesser*, 870 F.3d at 717.[4]

Although *Schloesser* is not one of them, there are a few published Seventh Circuit cases that have stated that reversal is only appropriate if the record compels a contrary result. The first such case appears to be *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021), which quoted *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010) (quoting *Moab v. Gonzales*, 500 F.3d 656, 660 (7th Cir. 2007)). The quoted language was actually the standard of review for immigration cases. *See* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact [in an order of removal] are conclusive unless any reasonable adjudicator would be compelled to conclude to

---

[4] The Court assumes this miscitation is the result of a cut-and-paste error. Counsel shall take care to more carefully check their citations in the future.

4

the contrary").  The Social Security Act does not contain this language, but rather provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  As quoted above, the Supreme Court has defined substantial evidence in the Social Security context as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek, 587 U.S. at 103.  To the extent that the Commissioner's inclusion of this language in his brief is intended to suggest that "substantial evidence" should be interpreted to mean something different in this case than how it is defined in Biestek, the Court rejects that suggestion.

While the substantial evidence standard is deferential, the Court is still required to conduct an actual review of the Commissioner's decision.  The Supreme Court "has stressed the importance of not simply rubber-stamping agency factfinding" and noted that "[t]he APA [Administrative Procedures Act] requires meaningful review; and its enactment meant stricter judicial review of agency factfinding than Congress believed some courts had previously conducted."  Dickinson v. Zurko, 527 U.S. 150, 162 (1999).  The Supreme Court has further noted that

> The Social Security Act and the APA are different statutes, and courts must remain sensitive to their differences.  See, e.g., Sullivan v. Hudson, 490 U.S. 877, 885, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989) (observing that "[a]s provisions for judicial review of agency action go, § 405(g) is somewhat unusual" in that its "detailed provisions . . . suggest a degree of direct interaction between a federal court and an administrative agency alien to" APA review).  But at least some of these differences suggest that Congress wanted more oversight by the courts in this context rather than less, see ibid., and the statute as a whole is one that "Congress designed to be 'unusually protective' of claimants," [Bowen v.] City of New York, 476 U.S. [467, 480 (1986)].

Smith v. Berryhill, 587 U.S. 471, 482 (2019) (footnote omitted).  Thus, while the Commissioner correctly notes that the Seventh Circuit has stated that "'social-security adjudicators are subject to

5

only the most minimal of articulation requirements,'" [Dkt. 14 at 4] (quoting *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024)), the Court's duty to conduct a meaningful review of the ALJ's decision remains unchanged.

### III.  ALJ Decision

ALJ Roberson first determined that Claimant had not engaged in substantial gainful activity since June 13, 2019, which was the date the adjudicative period commenced.[5] [Dkt. 10-2 at 14.]  At step two, the ALJ found that Claimant had the following severe impairments: "degenerative joint disease of the feet; bilateral plantar fasciitis; lower extremity lymphedema; obesity; and major depressive disorder (20 CFR 404.1520(c) and 416.920(c))." *Id*.  The ALJ also found the following non-severe impairments:  "mild degenerative disc disease of the cervical and lumbar spine, left ear tinnitus and eustachian tube dysfunction, COPD, GERD, hypertension, prediabetes, hyperlipidemia, hypercholesterolemia, obstructive sleep apnea, primary insomnia, migraine, pronator teres syndrome of the left upper extremity, generalized anxiety disorder, and PTSD." *Id.*

At step three, the ALJ found that Claimant's impairments did not meet or equal a listed impairment during the relevant time period. *Id.*  ALJ Roberson then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except:  occasionally climb stairs and ramps; never climb ladders, ropes, or scaffolds; occasional balancing as defined in the Selected Characteristics of Occupations (SCO) of the DOT; occasional stooping, kneeling, crouching, and crawling; must avoid concentrated exposure to moving machinery and unprotected heights; no requirement to maintain a production rate pace; can

---

[5] The ALJ explained that Claimant had previously filed unsuccessful applications for SSI and DIB that she did not appeal, so the adjudicatory period began the day after those applications were denied at the reconsideration level.  [Dkt. 10-2 at 11.]

6

tolerate occasional changes in work setting; and occasional interaction with the general public, co-workers, and supervisors.

*Id.* at 16.

At step four, the ALJ found that Claimant was not able to perform her past relevant work during the relevant time period. *Id*. at 21. At step five, relying on testimony from a vocational expert ("VE"), the ALJ determined that Claimant was able to perform jobs that exist in significant numbers in the national economy, such as sorter, inspector, and assembler. *Id*. at 21. Accordingly, ALJ Roberson concluded Claimant was not disabled. *Id.* at 22.

## IV.  Discussion

Claimant suffers from lower extremity lymphedema, which the ALJ found to be a severe impairment. When asked by the ALJ at the hearing why she is no longer able to work full-time, Claimant testified that "I'm no longer just standing like I used to stand or walk the distance. And then with my lymphedema my feet stay swollen all, and my legs stay swollen all the time and it hurts." [Dkt. 10-2 at 56.] She testified that "if I'm sitting down for like 15 or 20 minutes I got to get up because my feet [swell]." *Id.* at 57. When asked what she does to alleviate her symptoms, she testified that she keeps her legs propped up or uses a "body machine" to try to reduce swelling.[6] *Id.* at 56-57.

Claimant argues that the ALJ erred by not including anything in his RFC determination to account for Claimant's need to elevate her legs to deal with her swelling and that the ALJ's subjective symptom evaluation is deficient. Because those two arguments are interrelated, the Court will address them together.

---

[6] Claimant was prescribed a Flexitouch system, which is a compression pump device designed to remove lymphatic fluid and reduce swelling from the legs and the trunk. *See* [Dkt. 10-7 at 172].

7

> The ALJ stated the following:
>
> The claimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent with the objective medical evidence. The medical evidence of record documents relatively little treatment for her severe physical impairments throughout the relevant period. The claimant's podiatrist recommended PT (e.g., 15F/4), but the record reflects no such treatment notes. Although custom orthotics were reportedly denied by insurance, she stated the below knee walking boot helped (15F/7, 18). At the last podiatry appointment of record, the claimant was fitted for and given ankle stabilizer braces (15F), but there is no mention of these at subsequent appointments with other treatment providers (19F). The claimant stated she could not wear the compression hose, but provided no explanation (15F/8); her podiatrist continued to recommend she wear them (e.g., 15F/18). She told her podiatrist the compression pump did not work (e.g., 15F/14), but she testified it did help, although sometimes she had to use it twice. The claimant reported foot pain primarily with walking and standing, which improved with rest. Despite her gait instability and lower leg swelling, she remained ambulatory (15F). Although the claimant's primary care physician noted lower leg swelling in June 2020 and August 2021, physical exams in 2019, 2022, and 2023 noted no edema, normal range of motion, and normal gait (12F, 19F). The claimant's primary care physician referred her to cardiology and vascular surgery for lower extremity edema (12F/42), but there is no indication she ever followed through with this. Cardiac workup for palpitations was normal (19F/49-53). The claimant has not required orthopedic or vein surgery, nor has she been referred to pain management. Despite the claimant's obesity, there is no indication she was ever referred to bariatrics or a dietician, or she has been prescribed a medically managed weight loss diet or medication for weight loss.

[Dkt. 10-2 at 18.] Almost none of the ALJ's reasons for rejecting Claimant's subjective symptoms testimony are actually supported by the record.

First, the ALJ takes issue with what he perceives as Claimant's lack of treatment and/or failure to comply with treatment recommendations, including physical therapy, referrals to specialists, and an ankle brace. SSR 16-3p governs how ALJ's are to evaluate a claimant's subjective symptoms claims. It provides, in relevant part:

> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities . . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or

> changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.
>
> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. **We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints**.

*Soc. Sec. Ruling 16-3p: Titles II & Xvi: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Mar. 16, 2016) (emphasis added) ("SSR 16-3p"). The ALJ failed to comply with this directive. He did not ask Claimant why she did not follow-up with the referrals to physical therapy[7] and specialists and why she did not wear compression hose, and he does not acknowledge or address the fact that there may have been good reasons for that failure.[8] *See id.* (listing various "reasons an individual may not have pursued treatment"); *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012) ("The claimant's 'good reasons' may include an inability to afford

---

[7] A note from a March 2019 visit states the Claimant "didn't go to PT because she didn't have the money." [Dkt. 10-7 at 70.]

[8] The ALJ states that Claimant "provided no explanation" for why she could not wear the prescribed compression hose. [Dkt. 10-2 at 18] (citing 15F/8). The ALJ did not ask Claimant why she could not wear compression hose. The most that can be said is that the medical records do not contain any explanation; that does not mean that Claimant did not provide one to her medical care provider. Doctor's notes are not transcripts of office visits. The note cited by the ALJ is from a podiatrist visit on January 6, 2022. *See* [Dkt. 10-7 at 279.] That same visit note states the Claimant "has attempted regular exercise, elevation, and compliant use of compression wraps or stocking." *Id.* at 281. A note from a podiatrist visit on August 30, 2022, states "Compression pump not helping. Advised to possibly use compression sock and elevate both limbs as much as possible." *Id.* at 286. This note was repeated on October 18, 2022, and November 29, 2022. *Id.* at 289, 687.

treatment, ineffectiveness of further treatment, or intolerable side effects.'"). *Id.* (citing *Titles II & Xvi: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements,* SSR 96-7P (S.S.A. July 2, 1996) (predecessor to SSR 16-3p)).

The ALJ's comment regarding Claimant's ankle brace is particularly concerning, as he seems to be inferring that Claimant was not wearing her ankle brace as prescribed simply because the ankle brace is not mentioned in treatment notes made by medical care providers who did not prescribe it. Treatment notes reflect things that are important to the medical care providers on the day in question. It is simply not reasonable to infer anything from the fact that a primary care physician seeing a patient for, say, "follow-up of prediabetes," [Dkt. 10-7 at 246], would not mention that the patient was (or was not) wearing an ankle brace.

If the ALJ had asked Claimant why she (apparently) did not follow up on referrals or comply with certain treatment recommendations, he might have learned that she did and that the relevant records were missing from the record. *See* [Dkt. 12 at 23-24] (Claimant's brief noting evidence of recording suggesting that Claimant did undergo physical therapy). Or he might have learned that she was unable to afford the recommended treatment or that the side effects from, say, wearing compression socks were too severe. Or he might have learned that Claimant did not have a good reason for failing to comply with treatment recommendations. We do not know, because the ALJ failed to fulfill his obligation to ask. *See* SSR 16-3P (quoted above); *Wilder v. Kijakazi,* 22 F.4th 644, 653 (7th Cir. 2022) ("Social Security Rulings lack the force and effect of law, but they are binding on ALJs.").

Similarly, had the ALJ asked why there were no records of treatment for her foot and leg problems after November 2022—over a year prior to the date of the hearing—he might have learned that she did receive such treatment but the updated records had not made it to the record.

10

*See* SSR 16-3p ("We will not evaluate an individual's symptoms without making every reasonable effort to obtain a complete medical history."). The ALJ was obligated to ask these questions, either at the hearing or otherwise. He was not entitled to guess what the answers to the questions would have been and then use those hypothetical answers against Claimant by drawing adverse inferences from her perceived failure to comply with treatment recommendations.

Next, the ALJ noted that Claimant "told her podiatrist the compression pump did not work (e.g., 15F/14), but she testified it did help, although sometimes she had to use it twice." [Dkt. 10-2 at 18.] The Court assumes the ALJ notes this fact to point out that Claimant had made inconsistent statements about her compression pump. Claimant reported that her pump did not help in August 2022. The same note was repeated in October 2022 and November 2022, [Dkt. 10-7 at 289, 291], although it is not clear whether the pump was actually discussed at those visits or whether those repeat notes were simply copied from the earlier notes. None of the notes indicate whether Claimant was told to continue to use the pump to see if she would see results with repeated use. It is not necessarily inconsistent for the pump to not have helped initially but to have begun helping by the February 2024 hearing. The ALJ again did not ask for clarification regarding the inconsistency he perceived; he merely drew an inference unfavorable to Claimant based on very limited information.

Next, the ALJ notes the following: "The claimant reported foot pain primarily with walking and standing, which improved with rest. Despite her gait instability and lower leg swelling, she remained ambulatory (15F)." [Dkt. 10-2 at 18.] The import of this statement is unclear. Claimant does not claim that she is not ambulatory; she claims that she cannot ambulate as much as is required to perform full-time work without experiencing swelling and pain.

11

Next, the ALJ notes: "Although custom orthotics were reportedly denied by insurance, she stated the below knee walking boot helped (15F/7, 18)." *Id.* The record indicates that the knee walking boot was prescribed by Claimant's podiatrist for a specific issue—"5th metatarsal pain and PB tendinitis L"—that arose in 2022, *see* [Dkt. 10-7 at 256], and that using the boot for four weeks improved that condition and Claimant was told she could discontinue it. Tendinitis is not one of the impairments found by the ALJ and appears to have been an acute issue. It is thus unclear how this statement is relevant to Claimant's identified impairments or the subjective symptoms she experiences from them. The same is true of the ALJ's statement that "[c]ardiac workup for palpitations was normal (19F/49-53)." [Dkt. 10-2 at 18.]

Next, the ALJ states: "Although the claimant's primary care physician noted lower leg swelling in June 2020 and August 2021, physical exams in 2019, 2022, and 2023 noted no edema, normal range of motion, and normal gait (12F, 19F)." Most of Claimant's visits to her primary care physician were for medical issues completely unrelated to Claimant's feet and legs (e.g. gynecological issues, tinnitus, mental health issues); it is unsurprising that the notes for those visits do not mention whether Claimant's feet and legs were swollen. However, her medical providers noted swelling at more than the two visits cited by the ALJ. Notes from February 2019 and March 2019 visits with her primary care physician indicate bilateral pitting edema in Claimant's lower extremities. [Dkt. 10-7 at 70, 75.] A visit note from August 2022 lists "foot pain (both feet, swelling") as a chief complaint, although later in the Review of Systems section (not the physical exam section) it states "negative for leg swelling." [Dkt. 10-7 at 174, 175.] The physical exam portion of the notes does not indicate whether the provider checked for foot swelling. A note from May 2022 states "positive for leg swelling (nothing more

than normal)"[9] in the Review of Systems. *Id.* at 183. Notes from podiatrist visits in September 2021, October 2021, January 2022, August 2022, October 2022, and November 2022 all note pitting edema. *Id.* at 171, 255, 274, 277, 289, 292. It is unclear why the ALJ believes a few notations of no edema,[10] in some primary care records is relevant to Claimant's claim that she has swelling in her legs and feet; clearly, she does, even if it has not been noted 100% of the time.

It is also unclear what relevance the ALJ believes Claimant's normal range of motion and normal gait have, or why the ALJ believes she would have required orthopedic or vein surgery if her symptoms were as severe as she claims; those things are not self-evident, and the ALJ does not explain them. Finally, the ALJ states: "Despite the claimant's obesity, there is no indication she was ever referred to bariatrics or a dietician, or she has been prescribed a medically managed weight loss diet or medication for weight loss." [Dkt. 10-2 at 18.] It is unclear why the fact that Claimant's medical providers have failed to suggest proactive action with regard to Claimant's obesity is inconsistent with Claimant's alleged subjective symptoms and, again, the ALJ does not explain his reasoning.

The ALJ's explanation for his subjective symptom evaluation is not supported by the record. To make this finding is not, as suggested by the Commissioner, to improperly "reweigh" the evidence; it is to point out that the ALJ failed to satisfy his obligations under the applicable

---

[9] Presumably this means not more than normal for the Claimant, as swelling is not generally "normal."

[10] The ALJ does not cite to specific records, but rather to the primary care physician's records as a whole. The Court notes that some of the references to "no edema" in those notes specifically refer to Claimant's back, not her feet. *See, e.g.*, [Dkt. 10-7 at 184.] Others note "no edema" under the "musculoskeletal" portion of the exam notes, which is more ambiguous. *Id.* at 239; 245.

13

law to comply with the applicable regulations and the agency's own rulings and to "rest [his] denial of benefits on adequate evidence contained in the record and [] explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

This leads to the other significant error in the ALJ's opinion—his failure to address the evidence of record that Claimant needed to elevate her legs and explain why he found that either (1) she was not actually required to do so or (2) the need to do so would not affect her ability to work and therefore did not need to be addressed in the RFC. Claimant testified that to alleviate the swelling in her legs she either uses her compression machine or keeps her legs propped, which she described as putting two pillows under them while in bed. Claimant's treating physician repeatedly advised Claimant to elevate her legs "as much as possible." [Dkt. 10-7 at 255, 289, 292.] Claimant's attorney elicited testimony from the VE that the requirement to elevate one's legs "above a standard footstool height, which is 12 inches" while seated at work would be work preclusive. [Dkt. 10-2 at 74.] Claimant is correct that the ALJ's failure to confront this evidence was error.

The Commissioner argues the following:

Plaintiff's argument is without merit. Although Plaintiff's medical providers advised her to elevate her legs "as much as possible," they did not instruct her to elevate her legs above footstool height or 12 inches (Dkt. 10-7 at pp. 255, 285, 289, 292, 297, R. 650, 680, 684, 687, 692). Furthermore, although Plaintiff testified that she used a compression pump for one or two hours a day (Dkt. 10-2 at p.70, R. 69), despite reporting to her providers that the compression pump did not help (Dkt. 10-7 at p.255, 285, 289, 292, 297, R. 650, 680, 684, 687, 692), Plaintiff did not present any medical evidence that she was required to use a compression pump during work hours. Accordingly, Plaintiff has not met her burden of showing that her RFC needed to include an accommodation to elevate her legs above footstool height during an 8-hour workday. Omission of such a limitation was proper.

14

[Dkt. 14 at 9.] This argument is, frankly, rather silly. The Court once again notes that medical visit notes are not transcripts; the most that can be said is that the notes do not indicate how high Claimant needs to elevate her legs. It is highly likely that Claimant's medical providers would have told her to elevate her legs above her heart; simple physics suggests that that is the type of elevation that helps reduce swelling. *See, e.g.* Center for Vascular Medicine Blog, https://www.cvmus.com/blog/top-tips-elevate-legs-and-mistakes-avoid (last visited August 15, 2025) ("Elevating a limb, especially the legs, above the heart allows the blood to circulate back to the heart without fighting gravity. The heart still pumps blood to these extremities, but the stress on the heart is reduced. This helps to mitigate swelling and brings fresh and oxygenated blood to the limbs. . . . Raising your legs above your heart, in any matter, will provide some benefit. However, it's not as simple as putting your feet up on an ottoman or a table. . . . When elevating your legs it may help to make it a dedicated effort and not simply put your legs up on a table or sofa. The higher above your heart you can get your legs, the more benefit you will get from the movement." ). If the ALJ was unaware of this fact, he should have sought clarification; it is not reasonable for the Commissioner to expect Claimant's visit notes to include every detail of her visit, such as the precise instructions for how to elevate her legs. And, in any event, the ALJ did not find that Claimant did not need to elevate her legs above twelve inches; he did not make any finding at all about her need to elevate her legs. It was error for the ALJ to simply ignore this issue.

  While it is true, as the Commissioner argues, that "'[a]n ALJ need not . . . cite support for every proposition or chain of reasoning,'" [Dkt. 14 at 4] (quoting *Warnell*, 97 F.4th at 1053, it is equally true that an "ALJ may not ignore 'an entire line of evidence that supports a finding of disability,'" *Combs v. Kijakazi*, 69 F.4th 428, 435 (7th Cir. 2023) (quoting *Jones v. Astrue*, 623

15

F.3d 1155, 1162 (7th Cir. 2010)), and the ALJ is required "to 'confront the evidence that does not support [his] conclusion and explain why it was rejected.'" *Cain v. Bisignano*, ___ F.4th ____, 2025 WL 2202133, at *3 (7th Cir. Aug. 4, 2025) (quoting *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) (in turn quoting *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). The evidence at the hearing established that the need to keep one's legs elevated can be work preclusive and that Claimant was instructed to keep her legs elevated as much as possible. The ALJ erred in not confronting this evidence in his decision. Unless the ALJ could (and did) point to substantial evidence in the record to support a finding that it was not necessary for Claimant to elevate her legs about twelve inches during the workday, it was error for him not to account for that need in the RFC determination.

      Remand is required for the ALJ to properly consider and to explain his findings regarding Claimant's subjective symptom allegations and her need to elevate her legs. On remand, the ALJ also shall consider and address the impact, if any, of Claimant's migraines on his RFC determination.

## V.  Conclusion

      For the reasons stated above, the Commissioner's decision is **REVERSED and REMANDED for further proceedings consistent with this Order**.

      SO ORDERED.

Dated:  19 AUG 2025

                                            Mark J. Dinsmore
                                            United States Magistrate Judge
                                            Southern District of Indiana

Distribution:

Service will be made electronically on
all ECF-registered counsel of record via
email generated by the Court's ECF system.